**Dean Rene PETERS, Appellant,**

v.

**Jack T. RUTLEDGE, Sheriff and Jailer of Muscogee County, Georgia, Appellee.**

**No. 25075.**

United States Court of Appeals
Fifth Circuit.

June 6, 1968.

---

11. Bell v. Hood (1946), 327 U.S. 678, 682, 66 S.Ct. 773, 776, 90 L.Ed. 939.

1. Bell v. Hood (1946), 327 U.S. 678, 682, 66 S.Ct. 773, 776, 90 L.Ed. 939.

Archie L. Haden, Jr., Columbus, Ga., Kirk McAlpin, Jack H. Watson, Jr., Atlanta, Ga., for appellant.

Frank K. Martin, Asst. Sol. Gen., Columbus, Ga., Mathew Robins, Asst. Atty. Gen., Atlanta, Ga., for appellee.

Before BROWN, Chief Judge, and AINSWORTH and GODBOLD, Circuit Judges.

JOHN R. BROWN, Chief Judge:

■ Appellant Peters seeks review of an order denying without an evidentiary hearing his petition for habeas corpus. Appellant raises a massive assault on his state conviction for burglary, asserting (1) use of illegally seized evidence against him at his trial, (2) systematic exclusion of Negroes from the grand and traverse (petit) juries by which he was indicted and convicted, (3) exclusion of all non-property owners from the grand and traverse juries, (4) unconstitutional restriction in cross-examination of a witness for the prosecution, and finally, (5) unconstitutional denial of his right to appeal because, through no fault of his own, his motion for rehearing in the Georgia Court of Appeals was not timely filed. Reaching the merits on only one of Appellant's claims—that he was subjected to an illegal arrest and that illegally seized evidence was introduced at trial against him—we affirm the decision of the District Court. Because of Appellant's failure to exhaust his available state remedies [1] on his other claims, they are denied without prejudice to Appellant to apply for habeas corpus relief in the Georgia State Courts.

■ Since the facts surrounding Appellant's arrest and the accompanying search of his person which produced a roll of paper currency that was introduced against him at trial have been fully developed at Appellant's trial and adequately but unsuccessfully presented to the Georgia Courts, we proceed to the determination of whether any constitutional infirmity exists in the introduction of that evidence.[2]

On March 6, 1966, H. Rothschild, Inc., in Columbus, Georgia was burglarized and its safe broken into. During the course of their investigation into this burglary, police officers received information from a reliable informer with whom they had dealt before that Appellant had a large roll of money on him and that the money came from the Rothschild's safe. On the basis of this information the officers tried to procure an arrest warrant for Peters, but they were unable to get in touch with a Magistrate. The evidence shows that the officers used all reasonable efforts to secure a warrant but were simply unable to do so. A later call by the informer revealed that Appellant was sitting in a local bar but was about to leave town, and could be easily identified by a scratch on his forehead, an injury suffered while opening the Rothschild safe. As that particular bar was only two blocks from the Georgia-Alabama state line, the officers immediately rushed to the location. Upon entering the bar the officers saw Appellant. The information supplied by the informer was further corroborated by Appellant's appearance, which indeed revealed a scratched forehead. The police

---

1. See Georgia's new comprehensive post-conviction procedure, effective July 1, 1967, Habeas Corpus Act of 1967, Act No. 562 (S.B. 171), Ga.Laws pp. 835–839, 1967 Sess., approved April 18, 1967, reproduced as an appendix to McGarrah v. Dutton, 5 Cir., 1967, 381 F.2d 161, 166.

2. Cf. 28 U.S.C.A. § 2254(d), as amended, Nov. 2, 1966, Pub.L. 89–711, § 2, 80 Stat. 1105.

arrested Appellant and the search incident to that arrest disclosed a large roll of bills later identified as being from the burglarized safe.[3] This telling evidence was introduced against Appellant at his trial in the state court.

■ Appellant's contentions regarding the legality of the introduction of the evidence basically miss the point. A habeas corpus proceeding in the federal court is not the equivalent of an appeal. Our concern in the habeas cases is not to determine whether the arrest and subsequent search were illegal under Georgia law, that is, whether a trial error or mistake was made, but whether the arrest and search and seizure comport with federal constitutional standards under the Fourth and Fourteenth Amendments.[4] The two are quite different.[5] As to the state law error the Georgia Courts have determined that Appellant's arrest was legal under Georgia law, see Peters v. State, 1967, 115 Ga.App. 743, 156 S.E.2d 195. Nevertheless, for the more restrictive federal assessment "we are warranted in examining that arrest to determine whether, notwithstanding the legality under state law, * * * [the search] may offend federal constitutional standards of reasonableness." Ker v. State of California, supra, 374 U.S. at 38, 83 S.Ct. at 1632, 10 L.Ed.2d at 741; Amador-Gonzalez v. United States, 5 Cir., 1968, 391 F.2d 308. Assaying it under federal standards we find that Appellant's arrest was reasonable and the evidence seized thereby was

properly admitted into evidence against him.

The fact situation here is remarkably similar to that of McCray v. State of Illinois, 1967, 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62, a case cited to us on this point by neither party. In that case an informer with whom the police had worked for many years informed them that McCray was possessing narcotics. The officers proceeded with the informer to the spot where they thought McCray could be found. Upon arriving at that location, the officers saw McCray duck between two buildings as soon as he saw the police car. The officers arrested McCray for possession of narcotics and the search incident to the arrest revealed drugs which were introduced against him at trial. The Supreme Court held that on these facts there was probable cause to sustain the reasonableness of the arrest and the subsequent search. The Court found that the background information furnished by the informer as to why he thought McCray was possessing narcotics and the reliability of the informer as testified to by the police, along with the officers' personal observations of McCray, were a sufficient basis for a reasonable man to conclude that McCray had committed or was committing an offense. See also Draper v. United States, 1959, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed. 2d 327; Cf. Juarez-Flores v. United States, 5 Cir., 1968, 394 F.2d 161.

■ The circumstances in the present case were also sufficient to sustain the

---

3. One of the bills taken from appellant had peculiar writing on it and several employees at Rothschild's remembered seeing it and putting it in the burglarized safe.

4. Ker v. State of California, 1963, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726; cf. Luna v. Beto, 5 Cir., 1968, 395 F.2d 35 (en banc) (concurring opinion).

5. The distinction is easily seen when habeas cases and direct appeals are compared. In the present case the Georgia courts had already determined that the arrest was legal, thus leaving to us only the constitutional issues. Compare

Amador-Gonzalez v. United States, 5 Cir., 1968, 391 F.2d 308, [No. 23480, January 10, 1968] where we held on direct appeal that an arrest by state officers for a federal offense did not comport with the Fourth Amendment. But in Alexander v. United States, 5 Cir., 1968, 390 F.2d 101, we held on direct appeal that an arrest by a federal employee was unlawful under the Texas law invoked to justify the arrest. Neither of these two cases empowers us to interpose our opinion of what Georgia law is or should be in the face of Georgia's determination so long as no constitutional rights are violated. See Sutherland v. Wainwright, 5 Cir., 1968, 399 F.2d 303.

conclusion that a reasonable man would believe that appellant had committed an offense. The information given by the informer, although probably enough in itself, was further corroborated when the officers saw the injury on Appellant's face. There was probable cause here.[6]

Another argument made by Appellant, which would need no further discussion if it were not for the vigor with which it is pressed, is that the delay in taking Appellant before a Magistrate rendered the arrest void *ab initio* and thus illegal. Although this contention was decided adversely to Appellant by the Georgia Court of Appeals, see Peters v. State, supra, we pause only to point out that since the delay did not under state law render the arrest void, no federal rights were violated. As we said in Edwards v. Holman, 5 Cir., 1965, 342 F.2d 679, 683, cert. denied, 1966, 384 U.S. 1017, 86 S.Ct. 1934, 16 L.Ed.2d 1039, "the federal rule requiring an arrested person to be taken without unnecessary delay before a committing magistrate has no application to one arrested on a state charge and in the custody of state officers." [7]

None of the other contentions raised need be considered on the merits even though it is certain that as to some, if not all, an evidentiary hearing will be required, for Appellant has never presented them to the Georgia Courts either on direct appeal or by habeas corpus. This raises the question: What should be done? Remand it for an evidentiary hearing by the Federal Court, since such a hearing will obviously be required somewhere? Or, by affirming without prejudice, in effect remand the matter for initial state court action?

The answer now, as in the past year,[8] is twofold. First, in the interest of comity we require that constitutional challenges to state convictions should first be presented to the state courts. Second, even though the issue has been presented to the state courts so that it is technically ripe for Federal habeas, if an evidentiary hearing is required then that hearing should be had ordinarily in those state courts where a fully effective, practicable procedure is available under state law. This is especially true in a state such as Georgia which has recently enacted its far-reaching post-conviction Habeas Corpus Act of 1967, Act No. 562 (S.B. 171), Ga.Laws, pp. 835–839, 1967 Sess., approved April 18, 1967.[9]

Except that it commits the power to the court having territorial jurisdiction over the place of confinement rather than vesting it in the original sentencing court this new act is remarkably like 28 U.S.C.A. § 2255.[10] By its plain terms it assures a hearing unencumbered by the strict conditions arising from some of

---

6. Interestingly enough, the Court's majority opinion in *McCray* did not even discuss whether an arrest warrant should have been necessary, in spite of a vigorous dissent by Mr. Justice Douglas. See McCray v. State of Illinois, supra, 386 U.S. at 314, 87 S.Ct. at 1064, 18 L.Ed.2d at 72. This silence on the part of the majority goes a long way, we feel, in bolstering our rejection of Appellant's contention that the officers needed an arrest warrant.

7. See also Hancock v. Nelson, 1 Cir., 1966, 363 F.2d 249, cert. denied, 386 U.S. 984, 87 S.Ct. 1292, 18 L.Ed.2d 234; Ralph v. Pepersack, 4 Cir., 1964, 335 F.2d 128, cert. denied, 1965, 380 U.S. 925, 85 S.Ct. 907, 13 L.Ed.2d 811; Howard v. State of Florida, S.D.Fla., 1966, 259 F.Supp. 499.

8. See Mobley v. Dutton, 5 Cir., 1967, 380 F.2d 14; Clarke v. Grimes, 5 Cir., 1967, 374 F.2d 550.

9. Reprinted in full as an appendix to McGarrah v. Dutton, 5 Cir., 1967, 381 F.2d 161, 167.

10. See, for example, Ga.Code § 50–127 (1):

"Any person imprisoned by virtue of a sentence imposed by a State court of record who asserts that in the proceedings which resulted in his conviction there was a substantial denial of his rights under the Constitution of the United States or of the State of Georgia or the laws of the State of Georgia may institute a proceeding under this section. * * *"

See the Appendix to McGarrah v. Dutton, supra; cf. 28 U.S.C.A. § 2255.

the Georgia cases. It is an effective remedy for securing state court review of federal challenges to state convictions. More than that it is a legislative recognition by Georgia of its responsibilities under the Supremacy Clause to vindicate federally-guaranteed, federally-protected rights in the administration of justice.[11]

 This places responsibility where it squarely belongs and where Georgia wants it. And in Milton v. Wainwright, 5 Cir., 1968, 396 F.2d 214, and others [12] we have made it clear that we ought to effectuate the policies underlying such statutes by making immediate use of them even in older cases now requiring an evidentiary hearing, not postponing application of the new procedure to cases arising in the state court after enactment of the post-conviction remedy. We there had this to say: "We are now committed to the fullest exploration of the many new and urgently needed state post-conviction remedies. In the long run, time is saved and constitutional rights are better vindicated by assuring that state mechanisms to ascertain and find facts are fully used. We reject again, as we have so many times recently the beguiling appeal of remanding it for the Federal Judge to do what is initially the clear duty of the State Court." 396 F.2d at 215.

We have taken such action in a number of Texas cases by requiring that petitioners now return to state courts to utilize Article 11.07 in which the Texas Courts, responsive to their awareness of the Supremacy Clause, have infused much vigor by making it the exclusive route. In State of Texas v. Payton, 5 Cir., 1968, 390 F.2d 261, instead of remanding to the Federal District Court for further evidentiary hearings on issues as to which the § 2254 exhaustion of remedies was satisfied, we dismissed the writ thereby in effect requiring the petitioner to proceed first in the state court [13] under the new scheme.

What we said there for Texas is true for Georgia too.

"The State District Court in which Payton was convicted is in the best position to evaluate and weigh the testimony during and circumstances surrounding the trial and hearing on motion for new trial. The witnesses who testified and who may be needed to testify at any additional hearing deemed necessary under this opinion would be readily available to that court, as would the attorneys concerned with the case. Most important is the

---

11. See Georgia Habeas Corpus Act of 1967, reprinted as an Appendix to McGarrah v. Dutton, supra:

"Section 1. *Statement of Legislative Intent and Purpose.* The General Assembly finds that expansion of the scope of habeas corpus in federal court by decisions of the United States Supreme Court, together with other decisions of said court (a) substantially curtailing the doctrine of waiver of constitutional rights by an accused and (b) limiting the requirement of exhaustion of state remedies to those currently available, have resulted in an increasingly larger number of state court convictions being collaterally attacked by federal habeas corpus based upon issues and contentions not previously presented to or passed upon by courts of this State; that such increased reliance upon federal courts tends to weaken state courts as instruments for the vindication of constitutional rights, with a re-

sultant deterioration of the federal system and federal-state relations; that to alleviate said problems, it is necessary that the scope of state habeas corpus be expanded and the state doctrine of waiver of rights modified. The General Assembly further finds that expansion of state habeas corpus to include many sharply-contested issues of a factual nature requires that only the superior courts have jurisdiction of such cases."

12. See notes 14 and 15, infra.

13. See State of Texas v. Payton, supra, 390 F.2d at 270:

"We believe however that principles of comity, of cooperation and of rapport between the two sovereigns require a different disposition. We remand with instructions to deny any relief and dismiss the Writ, without prejudice to Payton's right to reapply for relief to the State court in which he was convicted."

fact that deference to the State court in this case would further reduce the possibility of friction and fortify the rapport between State and Federal Judges and would strengthen the holding of the Texas Court of Criminal Appeals in Ex parte Young, supra, [418 S.W.2d 824] at p. 270, that the duties and responsibilities of State and Federal Judges in the administration of federal constitutional law are co-equal."

State of Texas v. Payton, supra,. 390 F.2d at 271. We have done it recently in Florida, see Milton v. Wainwright, supra, as in Texas,[14] and we've done the same in Georgia.[15]

We are aware, of course, that Georgia has imposed rigid, sometimes technical restrictions on its former habeas corpus relief. See McGarrah v. Dutton, 5 Cir., 1967, 381 F.2d 161, 165; Mobley v. Dutton, supra; Whippler v. Balkcom, 5 Cir., 1965, 342 F.2d 388; Smart v. Balkcom, 5 Cir., 1965, 352 F.2d 502; Cobb v. Balkcom, 5 Cir., 1964, 339 F.2d 95. And there may be some who apprehend that the Georgia courts will interpret or apply the new act with a like approach. One source of difficulty has been its restrictive, distinctly non-federal, rule of waiver.[16] But the new Act seems to have expressly adopted the Federal standards of waiver.[17]

But until such time as the Georgia Supreme Court interprets it otherwise, either directly or in its application, we credit—as the Full Faith and Credit Clause of the same Constitution commands—the words used in the Act.[18] The statutory structure is a good one. It retains initial responsibility where it belongs. It gives to the state the opportunity for full development of evidentiary facts in its own courts. If a full and fair evidentiary hearing satisfying Fay v. Noia [19] is held it makes unnecessary in most cases any further factual hearing by a federal court if, after state-court denial of post-conviction relief, the

14. See also Woodbury v. Beto, 5 Cir., 1968, 395 F.2d 189; Taylor v. Beto, 5 Cir., 1968, 392 F.2d 566; Beto v. Conley, 5 Cir., 1968, 393 F.2d 497; Waters v. Beto, 5 Cir., 1968, 392 F.2d 74.

15. See Mobley v. Dutton, 5 Cir., 1967, 380 F.2d 14; Clarke v. Grimes, 5 Cir., 1967, 374 F.2d 550. We said in the *Clarke* case, 374 F.2d at 552–553 that "in the exercise of comity and good federalism as well as proper federal-state relations, the Georgia state courts should first have an opportunity to rule on this question as presented in this case. It would be unseemly in our dual system of government under these circumstances for a federal court to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation."

Following *this reasoning, we held that* Clarke was required to exhaust the state remedy then available to him even though Georgia case law indicated that his attack on the constitutional validity of qualifying jurors for the death penalty would not be successful. Likewise, in Mobley v. Dutton, supra, we held that the Georgia state court was the proper forum, under the new Habeas Corpus Act of 1967, to determine the facts surrounding Mobley's allegedly coerced confession de- spite the fact that he had technically exhausted his state remedies by presenting his contentions on direct appeal.

16. Compare Cobb v. Balkcom, supra, and Smart v. Balkcom, supra, with Strauss v. Grimes, 1967, 223 Ga. 834, 158 S.E.2d 404, and Clarke v. Grimes, 1967, 223 Ga. 461, 156 S.E.2d 91.

17. Following the first sentence set forth in note 10 supra, § 50–127(1) expressly provides:

"Rights conferred or secured by the Constitution of the United States shall not be deemed to have been waived unless it is shown that there was an intentional relinquishment or abandonment of a known right or privilege which relinquishment or abandonment was participated in by the party and was done voluntarily, knowingly and intelligently."

18. Ga.Code § 50–127(1), as pointed out in note 10 supra, provides grounds for relief substantially similar to 28 U.S.C.A. § 2255.

19. Fay v. Noia, 1963, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837. The Georgia Habeas Act provides for a trial-type hearing with proof being received "by deposition, oral testimony, or other evidence." Ga.Code § 50–127(7).

petitioner seeks as he then may, federal court habeas review.[20]

Following the statutory structure serves a triple public interest. First, the system, if followed and faithfully applied puts responsibility on the state. Second, it affords to the one contesting the conviction an effective remedy. Third, it represents a mutual, even though not jointly expressed, state legislative judgment and a federal judicial comity conclusion that the rapid, explosive expansion of federal habeas cases in state convictions represents a substantial threat to the administration of justice, all kinds, not just criminal.[21]

Granted that it is the obscure kernel —the handwritten, scrawled petition of a

Gideon that is often freighted with portentous consequences, the fact is, as even the most indulgent of Judges recognize, that in the great majority of these cases there is absolutely no merit whatsoever. Yet the statutory and inevitable priority of these cases requires the use of precious, irreplaceable judicial time to ferret out and reject the claims. In the meantime two things occur. First, the really meritorious case may be missed simply because the press of this volume denies Judges the time for adequate inquiry and study. Second, and equally important in a structure of laws, hundreds of other litigants wait and wait their turn, many to lose the value of a victory even if it comes.[22]

20. See 28 U.S.C.A. § 2254, as amended, Nov. 2, 1966, Pub.L. 89–711, § 2, 80 Stat. 1105.

21. From 1941 to 1958 state habeas case filings ran from 127 to 755 (see Rep. Jud.Conf.1959, pp. 86–88). There were percentage increases but not much in volume up through 1962 when they numbered approximately 1100. But with *Gideon's* blast in 1963 the volume jumped that year to 1903, reaching a total in 1967 of 5,948. To this must be added a

total of 1416 "other [state] prisoner petions" plus, of course, 1923 Federal § 2255, habeas or prisoner petitions. (See Rep.Jud.Conf.1967, pp. 136–137). The result is that of the 70,961 civil cases filed, 7804 were state prisoner petitions, and, adding 2639 federal prisoner petitions the grand total is 10,443 so that "[O]ne out of every seven civil actions commenced in the district courts during 1967 was a prisoner petition." Ibid. p. 137.

22. Of course as we emphasize later, it is not a question of trying to avoid work or shifting work from this court to another court. Nearly all courts today are faced with these mounting dockets. This would indeed include the Courts of Georgia, but as to these exploding dockets with respect to the United States Courts of Appeals, see Shafroth, Survey of the United States Courts of Appeals, 1966, 42 F.R.D. 243. In 6 years filings have practically doubled with pending cases tripled. See Table S–1, 42 F.R.D. 243, 292:

| Year | Filed | Terminated | Pending |
|------|-------|------------|---------|
| 1961 | 4204 | 4049 | 2375 |
| 1966 | 6548 | 5936 | 5387 |
| 1967 | 7069 | 6693 | 5763 |

The projections for future years proved too conservative in the very first year (1967). Additionally, actual experience of the Fifth Circuit requires a further 5.6% upward adjustment. For the next 6 years our increase reaches the spectacular heighth of 1858 cases in FY 1974, as follows:

| F.Y. | Shafroth | Fifth Circuit | Excess over Shafroth | Yearly Gain |
|------|----------|---------------|----------------------|-------------|
| 1969 | 1338 | 1413 | 75 | 165 |
| 1970 | 1422 | 1502 | 80 | 169 |
| 1971 | 1507 | 1591 | 84 | 173 |
| 1972 | 1591 | 1680 | 89 | 178 |
| 1973 | 1675 | 1769 | 94 | 183 |
| 1974 | 1759 | 1858 | 99 | 188 |
| | | | 521 | |

Total Gain FY 1969—FY 1974 . . . . . . . . . 1056

For workload purposes this figure (1056), while large, is actually misleadingly low. For in the single year FY 1974 the Court will have to dispose of 445 more

It is important that federal constitutional claims may be asserted after conviction. It is important that finally there be access to the Federal Court for its own independent judgment. But these rights do not call for two sets of full-blown post-conviction trials. This new Act serves that end. It should be fully exploited by all, including us.

The utilization of this new Georgia procedure is all the more important in view of the substantial nature of some of Appellant's constitutional challenges. The first concerns the composition of the jury. Appellant's trial began on December 7, 1966, in Muscogee County, Georgia. The very day before, December 6, 1966, this Court had decided the case of Vanleeward v. Rutledge, 5 Cir., 1966, 369 F.2d 584. That case dealt with the problem of the systematic exclusion of Negro residents of Muscogee County from grand and traverse (petit) juries. This Court found that the tax digests, from which prospective jurors were chosen, contained 39,170 names, 86 per cent of which were white and 14 per cent were Negro. The names of white taxpayers were kept on white sheets and the names of Negro taxpayers were kept on yellow sheets. On the traverse jury list, 3,470 names appeared, only 25 of which were Negroes, or .75 per cent of those on the list. We held that "the list as made up was so heavily weighted against the possibility of the inclusion of members of the Negro race in any traverse panel as to cause it to fall within the condemnation of the decided cases." 369 F.2d at 587. Additionally, Appellant points out that Section 92–6307, Ga.Code Ann., which required that the tax digests be segregated according to race, was not deleted from the Georgia laws until January 1, 1967. Also, the law requiring traverse jurors to be chosen from registered voters' lists instead of the tax digests did not become effective until March 30, 1967.[23] Although the present record does not contain any evidence on this matter there

cases than in FY 1969, a total of 356 in FY 1973 and 267 in FY 1972, or a total of 968 cases over FY 1969 in the short span of 3 years.

In determining the actual workload of the Court and its staff, there must be added the inescapable carry-over of cases to the next reporting year, as follows:

| FY | New Appeals | Carry-over from Preceding Fiscal Year—60% | Total Appeals Being Processed Annually |
|---|---|---|---|
| 1969 | 1413 | 793 | 2206 |
| 1970 | 1502 | 847 | 2349 |
| 1971 | 1591 | 901 | 2492 |
| 1972 | 1680 | 955 | 2635 |
| 1973 | 1769 | 1008 | 2777 |
| 1974 | 1858 | 1061 | 2919 |

Appeals from criminal convictions and in state habeas and § 2255 post-conviction cases now represent 47% of the filings in all of the Courts of Appeals (Rep. proceedings Jud. Conf., 1967, p. 90).

Both sets of courts, national and state, federal courts in Georgia and the Fifth Circuit and the courts of Georgia, undoubtedly join in the common goal that precious irreplaceable judicial resources should not be squandered on cases which are unnecessary. On the contrary, the judicial apparatus must explore with imaginative resourcefulness all innovations to make Judges, hence Courts, more productive. This is the constant theme of the Chief Justice. See Bros Inc. v. W. E. Grace Mfg. Co., 5 Cir., 1965, 351 F.2d 208, cert. denied, 1966, 383 U.S. 936, 86 S.Ct. 1065, 15 L.Ed.2d 852; John R. Brown, Federal Special Verdicts: The Doubt Eliminator, 1968, 44 F.R.D. 338. Clearly, newly enacted state machinery for post-conviction review fits this challenge for experimentation. This includes first a full development of the new techniques by the jurisprudence of the state and a similar approach by Federal Courts in development of a complementary procedure.

23. See Student Non-Violent Coordinating Committee v. Smith, 5 Cir., 1967, 382 F.2d 9, 12.

is a great likelihood that the challenge to the grand and traverse juries by which he was indicted and convicted may prevail.

One of the matters which the Georgia Courts may well necessarily have to consider initially is the extent to which our holding in Vanleeward v. Rutledge, supra, will operate either as a sort of *in rem* finding of fact on demonstrable historical facts which cannot likely vary, or at least as stare decisis with respect to the method of jury selection in Muscogee County and whether without further evidential proof that this method resulted in unconstitutionally constructed juries. Since Appellant's trial began one day after the decision in *Vanleeward*, but several months before effective changes were made in the method of jury selection, the Georgia courts may well determine that it is not necessary to prove again all the same facts and statistics that led this Court to reach the result that it did in *Vanleeward*. In these days of exploding dockets,[24] every consideration points toward an avoidance of this waste of judicial energy.

Appellant also challenges the composition of the grand and traverse juries on the basis that since the tax digests of Muscogee County included only the names of property owners, persons in the lower economic strata of that county were systematically excluded from jury service. In Brown v. Allen, 1953, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469, the Court held that "a use, nondiscriminatory as to race, of [a] tax list [does not violate] the Fourteenth Amendment * * *."[25] 344 U.S. at 474, 73 S.Ct. at 416, 97 L.Ed. at 498. But it should be noted that in Brown v. Allen the tax digests were not segregated as to race as are the digests here, and all manner of property, no matter how modest, was required to be listed. Whether the present case will be controlled by *Brown* we need not and do

not decide, but we do point out that although such a practice perhaps does not make out a prima facie case, Appellant may be able to carry his burden of proof to show that the use of the tax digests in this manner does result in systematic exclusion of significant classes apart from race. Cf. Labat v. Bennett, 5 Cir., 1966, 365 F.2d 698 (en banc), cert. denied, 1967, 386 U.S. 991, 87 S.Ct. 1303, 18 L.Ed.2d 334. Again these are questions which should be considered in the first instance by the Georgia courts on a fully-developed factual record.

Appellant also contends that he was denied his right to appeal his conviction to the Georgia Supreme Court through no fault of his own and was thereby denied due process of law. He alleges that his motion for rehearing in the Georgia Court of Appeals, evidently a prerequisite procedural step for appeal to the Supreme Court, was properly and timely deposited in the United States mail in time for it to arrive at the Atlanta courthouse within the statutory time limit if the mail had been properly delivered. But, says Appellant, the motion did not arrive promptly and he thus lost the right to appeal his case further. The State counters with the proposition that an appeal is not required as a part of due process and the mere mailing of the notice does not necessarily show due diligence.

■ Our difficulty is that no one knows what the facts are. Consequently this is again a matter that should first be factually explored by the Georgia courts. Since a factual issue on whether the notice was indeed mailed in time is presented, it can be resolved by the Georgia court. Then that court can determine whether Appellant's allegations, if proved would indeed entitle him to relief, either as a matter of state law or as a requirement of Fourteenth Amendment due process.

24. Allen v. Johnson, 5 Cir., 1968, 391 F. 2d 527.

25. See also Roach v. Mauldin, 5 Cir., 1968, 391 F.2d 907, where we observed that "in the absence of racial considerations

the use of tax digests, which necessarily exclude nonproperty owners, seems to have been settled as not prima facie unconstitutional * * *." 391 F.2d at 908.

Appellant also contends that the trial judge unconstitutionally restricted his right to cross-examine the witnesses against him in violation of the Sixth Amendment by not allowing his attorney to probe into the reliability of the informer whose information was the basis of Appellant's arrest. This contention was also raised in McCray v. State of Illinois, supra, and the Court there held that disclosure of an informant's identity was not in all cases constitutionally compelled. Again the facts are unknown. Whether the Constitution was breached turns entirely on the factual setting which the Georgia courts should determine initially after the facts are developed to show whether the cross-examination was unduly restricted to such an extent.

Thus the decision of the District Court is affirmed, partly on the merits and partly for the reason that Appellant has failed to exhaust his state remedies which are now so available and effectual. For all we know, the Georgia courts may grant the writ on one or more grounds. If not, then Appellant can return to the Federal Court for its inescapably independent judgment on federal issues.

Affirmed.